# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

|  |  |  |
|---|---|---|
| | * | |
| DEWANE WILMOTH | * | |
| 17502 Bunker Hill Road | | |
| Parkton, MD 21120 | * | |
| | * | Case No.: 1:26-cv-00480 |
| DONNA WILMOTH | * | |
| 17502 Bunker Bill Road | | |
| Parkton, MD 21120 | * | |
| | * | **JURY TRIAL DEMANDED** |
| *Plaintiffs*, | * | |
| | * | |
| v. | * | |
| | * | |
| THE STATE OF MARYLAND | * | |
| 200 Saint Paul Place, 20th Floor | | |
| Baltimore, MD 21202 | * | |
| | * | |
| MARYLAND DEPARTMENT OF | | |
| NATURAL RESOURCES | * | |
| 580 Taylor Avenue | | |
| Annapolis, MD 21401 | * | |
| | * | |
| JOSHUA KURTZ | * | |
| in his individual capacity | | |
| Maryland Department of Natural | * | |
| Resources | | |
| 580 Taylor Avenue | * | |
| Annapolis, MD 21401 | | |
| | * | |
| PAUL PEDITTO | * | |
| in his individual capacity | | |
| Maryland Department of Natural | * | |
| Resources | | |
| 580 Taylor Avenue | * | |
| Annapolis, MD 21401 | | |
| | * | |
| MARK SPURRIER | * | |
| in his individual capacity | | |
| Maryland Department of Natural | * | |
| Resources | | |
| 580 Taylor Avenue | * | |
| Annapolis, MD 21401 | | |

1

LUKE TERRELL                              *
in his individual capacity
Maryland Department of Natural            *
Resources
580 Taylor Avenue                         *
Annapolis, MD 21401
                                          *
        *Defendants*.
                                          *

*       *       *       *       *       *       *       *       *       *       *       *       *       *       *       *

## COMPLAINT

COME NOW Plaintiffs, Dewane and Donna Wilmoth ("Wilmoths"), by and through his attorneys, Michael N. Russo, Jr., Brian S. Burkett, Rebecca K. Schisler-Adams, and McKenna, Russo, Livingston, Burkett & Burgy, LLC, hereby file this Complaint against the State of Maryland Department of Natural Resources ("DNR"), Secretary Joshua Kurtz ("Secretary Kurtz") in his individual capacity, Paul Peditto ("Peditto") in his individual capacity, Mark Spurrier ("Spurrier") in his individual capacity, and Luke Terrell ("Terrell") in his individual capacity (collectively, "Defendants"). The Wilmoths assert claims for deprivation of their procedural due process rights, pursuant to 42 U.S.C. § 1983, and, pursuant to the Maryland Torts Claims Act, seek relief for injuries caused by the acts and/or omissions of Defendants in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Maryland statutory law.

## PARTIES

1.      Plaintiffs Dewane Wilmoth and Donna Wilmoth ("Plaintiffs" or "Wilmoths") are individuals who presently reside at 17502 Bunker Hill Rd., Parkton, Baltimore County, Maryland 21120. Plaintiffs are citizens of the State of Maryland.

2.      Defendant State of Maryland is a public entity that oversees the Maryland Department of Natural Resources.

2

3.      Defendant State of Maryland Department of Natural Resources ("DNR") is an agency of the State of Maryland with its principal place of business at Tawes State Office Building, 580 Taylor Avenue, Annapolis, Maryland 21401. Among its responsibilities, DNR is charged with operating and maintaining state parks, including Gunpowder Falls State Park.

4.      Secretary Kurtz is the current Secretary of the Maryland Department of Natural Resources. The Wilmoths sue Secretary Kurtz in his individual capacity.

5.      Peditto is the current Assistant Secretary for Land Resources within Maryland DNR. The Wilmoths sue Peditto in his individual capacity.

6.      Spurrier is the current Regional Manager for the Maryland Park Service. The Wilmoths sue Spurrier in his individual capacity.

7.      Terrell is the current Park Manager for Gunpowder Falls State Park. The Wilmoths sue Terrell in his individual capacity.

8.      Kurtz, Peditto, Spurrier, and Terrell are collectively referred to as "Individual Defendants."

**JURISDICTION AND VENUE**

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the United States Constitution, including claims for violation of the Fourteenth Amendment's Procedural Due Process Clause and the Fifth Amendment's Takings Clause.

10.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claims occurred in this district, and a substantial part of the property that is the subject of the action is situated in this district, specifically in Baltimore County, Maryland.

## FACTS

11.     Plaintiffs, Dewane and Donna Wilmoth, are a married couple who are residents of the State of Maryland. They are 65 and 61 years old, respectively.

12.     Dewane Wilmoth is retired. Earlier in his career, he was a mechanic for the State of Maryland and worked on tractors and equipment owned by the State. He is also very skilled at working with his hands, construction projects, and handyman tasks.

13.     At present, Dewane Wilmoth has no steady source of income aside from social security entitlements.

14.     Donna Wilmoth is a beloved cafeteria worker at Hereford Middle School.

15.     The Wilmoths have always loved the outdoors, and in particular, Gunpowder Falls State Park. Dewane Wilmoth, having prior knowledge that Maryland State Parks often lease residential homes on their property, always longed to reside at Gunpowder Falls State Park.

16.     On September 6, 2007, Mr. Wilmoth's dream came true, when the Wilmoths entered into a Dwelling Lease Agreement for the real property known as 5316 Forge Road, White Marsh, Maryland 21162 (the "Forge Road Property"). A copy of the lease is attached hereto as Exhibit A.

17.     The lease term for the Forge Road Property was retroactively dated August 13, 2007, and continued on a month-to-month basis with monthly rent set to $650.00.

18.     Plaintiffs resided in the Forge Road property until another property within Gunpowder Falls State Park became available, and the parties agreed that the Wilmoths would move.

19.     On or about November 19, 2018, Plaintiff and Defendants entered into a dwelling lease agreement for the property located at 17502 Bunker Hill Road, Parkton, Maryland 21120

(the "Bunker Hill Property"). A copy of the lease is attached hereto as Exhibit B.

20.    The Bunker Hill Property was not immediately ready for residence due to its poor condition. Rather, the Wilmoths spent significant time and effort from November 2018 to June 2019 making substantial improvements to the Bunker Hill Property so that it was "move-in ready."

21.    For the Bunker Hill Property, the monthly rent under the lease was $600, payable in advance on the first day of each month.

22.    For both leases to the Forge Road Property and the Bunker Hill Property, the express purpose of the lease(s) was Maryland's desire "to lease the Premises to Tenant on a short-term basis until such time as Landlord desires to reclaim use and possession of the Premises for public purposes" and moreover, the Lease was for the express "convenience of the State of Maryland inures to the benefit of Landlord."

23.    In pertinent part, the lease included several provisions regarding repairs to the Property, as follows:

> Landlord's Duties. Subject to the availability of funding, Landlord shall make those structural repairs and replacements necessary for safe use and occupancy of the Premises which cost Two Hundred Dollars or more, provided Tenant reimburses Landlord for the first Two Hundred Dollars ($200.00) cost of such repairs. If public funds are unavailable or inadequate to make such necessary repairs, Landlord may permit Tenant to make certain repairs to the Premises in lieu of rent. Any such agreement must be in writing signed by both parties and shall be in addition to all maintenance and repair obligations set forth for Tenant by the terms of this Lease.

> Rent Credit. Landlord may allow Tenant, on a case-by-case basis, to perform or have performed for rent credit, certain repairs improvements which may be necessary for the safety or preservation of the structure when Landlord's funds are unavailable or inadequate. Any and all repairs improvements must be agreed upon and approved in writing and in advance by Landlord. **Approved and applied rent credit that is pre paid for subsequent months will not be reimbursable to Tenant by Landlord if Tenant elects to terminate this Lease for any reason whatsoever or if Lease is**

**terminated by Landlord due to default of the Lease by Tenant.**

*See* Exhibit B, Section 15 (emphasis added).

24.     Said differently, the lease contemplated a program under which the tenant could perform repairs and improvements to the property in exchange for a lease rent credit (in lieu of monthly rent payments).

25.     Notably, the only contemplated situations wherein the prepaid rent credit would not be reimbursed to the tenant are 1) if the tenant terminates the lease, and/or 2) if the tenant defaults on the lease. There are no other contemplated scenarios wherein the Defendants may refuse to reimburse the tenant's rent credit upon termination of the lease under any other circumstances.

26.     Furthermore, the lease required that "[a]ll alterations or improvements become part of the real property and shall not be removed from the Premises at the end of the term."

27.     The Wilmoths made substantial and permanent improvements that had a useful life in excess of the remaining lease term.

28.     Taking together all improvements, the Wilmoths expended $262,516.83[1] in exchange for and/or in reliance on the promise of rent credit.

29.     Despite it being the landlord's obligation to maintain the premises, Dewane Wilmoth performed such significant improvements to the property that he developed and now suffers from necrotizing fasciitis.

30.     In general, the rent credit approval process worked as follows: a DNR representative, usually the Park Manager or Assistant Park Manager, would inspect the premises on a yearly basis in the normal course of the landlord/tenant relationship. From time to time, the

---

[1] This includes $221,986.94 in improvements approved in writing, $14,850 in improvements that were orally approved, but later revoked, and $25,529.89 in improvements necessary for the safety and habitability of the home from 2019 to 2025 as set forth more fully *infra*.

Park Manager or Assistant Park Manager would make periodic mid-year inspections for the sole purpose of evaluating property improvements for rent credits. During the inspection(s), the Wilmoths and the Park Manager would discuss the Wilmoths' ideas for the next phase of home improvement, the scope of the project, projected costs associated with the improvements, and whether the improvements were likely to be approved by DNR.

31.     Relying on these conversations, the Wilmoths would move forward with the agreed-upon scope of improvements. The Wilmoths were instructed to keep copies of all receipts and expenditures. The Wilmoths would be reimbursed for all materials, but not for their labor.

32.     Once the agreed-upon project phase was complete, the Wilmoths would submit their receipts to DNR for review and approval.

33.     As of the date of this filing, the Wilmoths' rent credit was so significant that they were told by the Department of Natural Resources that they were not required to pay rent until July 2037.

34.     The first rent credit was approved via letters dated November 1, 2007 and November 7, 2007 for an amount of $29,471.43. Applied to the rental account, this approval would cover rent through August 2011. The letter concluded by stating: "Thank you for your continued assistance. Your hard work and expertise is evident in the dwelling." A copy of the November 1, 2007 letter is attached hereto as Exhibit C, and the November 7, 2007 letter is attached hereto as Exhibit D.

35.     For the next year, the Wilmoths continued to make improvements to the property. By letter dated October 9, 2008, a rent credit in the amount of $16,905.28 was approved. Applied to the rental account, this approval would cover rent through September 2013. The letter concluded by stating: "Thank you for your continued assistance. Your hard work and expertise is evident in

the dwelling." A copy of the October 9, 2008 letter is attached hereto as Exhibit E.

36.    The Wilmoths continued to make improvements to the property. By letter dated May 13, 2009, a rent credit in the amount of $6,431.32 was approved. Applied to the rental account, this approval would cover rent through July 2014. The letter concluded by stating: "Thank you for your continued assistance. Your hard work and expertise is evident in the dwelling." A copy of the May 13, 2009 letter is attached hereto as Exhibit F.

37.    The Wilmoths continued to make improvements to the property. By letter dated June 4, 2010, a rent credit in the amount of $6,238.87 was approved. Applied to the rental account, this approval would cover rent through April 2015. The letter concluded by stating: "Thank you for your continued assistance. Your hard work and expertise is evident in the dwelling." A copy of the June 4, 2010 letter is attached hereto as Exhibit G.

38.    The Wilmoths continued to make improvements to the property. By letter dated June 20, 2011, a rent credit in the amount of $10,311.92 was approved. Applied to the rental account, this approval would cover rent through August 2016. The letter concluded by stating: "Thank you for your continued assistance. Your hard work and expertise is evident in the dwelling." A copy of the June 20, 2011 letter is attached hereto as Exhibit H.

39.    The Wilmoths continued to make improvements to the property. By letter dated August 26, 2011, a rent credit in the amount of $1,936.79 was approved. Applied to the rental account, this approval would cover rent through November 2016. The letter concluded by stating: "Thank you for your continued assistance. Your hard work and expertise is evident in the dwelling." A copy of the August 26, 2011 letter is attached hereto as Exhibit I.

40.    The Wilmoths continued to make improvements to the property. By letter dated January 27, 2012, a rent credit in the amount of $4,345.46 was approved. Applied to the rental

account, this approval would cover rent through June 2017. The letter concluded by stating: "Thank you for your continued assistance. Your hard work and expertise is evident in the dwelling." A copy of the January 27, 2012 letter is attached hereto as Exhibit J.

41.    The Wilmoths continued to make improvements to the property. By letter dated October 21, 2013, a rent credit in the amount of $17,894.98 was approved. Applied to the rental account, this approval would cover rent through September 2018. The letter concluded by stating: "Thank you for your continued assistance. Your hard work and expertise is evident in the dwelling." A copy of the October 21, 2013 letter is attached hereto as Exhibit K.

42.    The Wilmoths continued to make improvements to the property. By letter dated November 24, 2014, a rent credit in the amount of $13,081.98 was approved. Applied to the rental account, this approval would cover rent through June 2021. The letter concluded by stating: "Thank you for your continued assistance. Your hard work and expertise is evident in the dwelling." A copy of the November 24, 2014 letter is attached hereto as Exhibit L.

43.    The Wilmoths continued to make improvements to the property. By letter dated May 1, 2017, a rent credit in the amount of $22,489.10 was approved. Applied to the rental account, this approval would cover rent through April 2024. The letter concluded by stating: "Thank you for your continued assistance. Your hard work and expertise is evident in the dwelling." A copy of the May 1, 2017 letter is attached hereto as Exhibit M.

44.    The Wilmoths continued to make improvements to the property. By letter dated September 4, 2018, a rent credit in the amount of $15,314.73 was approved. Applied to the rental account, this approval would cover rent through April 2026. The letter concluded by stating: "Thank you for your continued assistance. Your hard work and expertise is evident in the dwelling." A copy of the September 4, 2018 letter is attached hereto as Exhibit N.

45.    The following chart summarizes the credits and timeline:

| Letter Date | Rent Credits Received | Rent Credited Through |
|---|---|---|
| 11/7/2007 | $29,471.43 | July 2011 |
| 10/9/2008 | $16,905.28 | September 2013 |
| 5/13/2009 | $6,431.32 | July 2014 |
| 6/4/2010 | $6,238.87 | April 2015 |
| 6/20/2011 | $10,311.92 | August 2016 |
| 8/26/2011 | $1,936.79 | November 2016 |
| 1/27/2012 | $4,345.46 | June 2017 |
| 10/21/2013 | $17,894.98 | September 2018 |
| 11/24/2014 | $13,081.98 | June 2021 |
| 5/1/2017 | $22,489.10 | April 2024 |
| 9/4/2018 | $15,314.73 | April 2026 |
| | **$144,421.86** | |

46.    In the Fall of 2018, the Wilmoths began to take possession of and make improvements to the Bunker Hill Property.

47.    By letter dated April 15, 2019, a rent credit in the amount of $60,932.74 was approved. The letter acknowledged that the amount of $53,422.09 was preapproved and would be carried over with the Wilmoths' new lease. Applied to the rental account, this approval would cover rent through May 2035. The letter concluded by stating: "Thank you for your continued assistance. Your hard work and expertise is evident in the dwelling." A copy of the April 15, 2019 letter is attached hereto as Exhibit O.

48.    The Wilmoths continued to make improvements to the property. By letter dated September 18, 2019, a rent credit in the amount of $16,632.34 was approved. Applied to the rental account, this approval would cover rent through June 2037. The letter concluded by stating: "Thank you for your continued assistance. Your hard work and expertise is evident in the dwelling." A copy of the September 18, 2019 letter is attached hereto as Exhibit P.

49.     The following chart summarizes the subsequent credits and timeline:

| Letter Date | Rent Credits Received | Rent Credited Paid Through |
|---|---|---|
| 4/15/2019 | $60,932.74 | April 2035 |
| 9/18/2019 | $16,632.34 | June 2037 |
| | **$77,565.08** | |

50.     At the yearly inspection for 2019, the Wilmoths and the Park Manager discussed the impending installation of a garage. At that time, the garage was on its way to the property but had not yet been delivered. The Wilmoths were instructed to follow up with the receipts for the garage once it had been installed.

51.     Following the installation of the garage, the Wilmoths submitted their receipts to DNR for approval in the normal course. The project totaled $14,850.

52.     Rather than having the receipts applied toward a future rent credit, the Wilmoths were told that DNR was no longer accepting rent credit applications and that the Wilmoths would not be reimbursed for this project phase.

53.     From 2019 to 2025, the Wilmoths continued to make necessary repairs to the home, including but not limited to enclosing the back porch with vinyl siding and windows, adding a concrete pad, replacing rotting lumber that was a risk to their health and safety, and installing a new hot water heater as needed for the functionality and habitability of the home. These improvements cost the Wilmoths $25,529.89, which has not been reimbursed.

54.     On November 4, 2025, the Wilmoths, without warning, received a letter from Peditto and DNR demanding that they vacate the premises by April 30, 2026. A copy of the November 4, 2025 letter is attached hereto as Exhibit Q. Peditto Carbon-Copied the Housing Review Committee, Mark Spurrier, and Luke Terrell on the letter.

55.     Upon information and belief, all Individual Defendants played a role in determining

that the Wilmoths' lease would be terminated, or otherwise adopted and condoned the decision to terminate the lease made by Peditto and the Housing Review Committee of DNR.

56.     The November 4, 2025 letter stated, "You are fully responsible for all rent until the actual date of vacancy."

57.     Notably, there is no mention of the rent credits owed to the Wilmoths in the November 4, 2025 letter, or the significant expenditures and improvements made by the Wilmoths.

58.     In response, the Wilmoths called Peditto to seek more information about the abrupt termination.

59.     During this phone call, Peditto told the Wilmoths that they would not be reimbursed the remaining $81,187.17 of the rent credit, which was only approved based on expenditures that the Wilmoths made for the State's benefit.

60.     The Wilmoths begged for the State to negotiate the lease's termination. Mr. Wilmoth offered to come back to work for the State of Maryland, for free, in exchange for being able to continue to reside at the premises.

61.     Peditto rebuked Mr. Wilmoth's offer. Instead, Peditto told Mr. Wilmoth, "You don't know who you're up against," and "I will bury you."

62.     Mr. Wilmoth understood Peditto's comments to be a threat against the initiation of litigation.

63.     Now, facing the threat of eviction if they do not vacate by April 30, 2026, the Wilmoths must find alternative means of housing.

64.     The Wilmoths have not budgeted for having to pay rent until July 2037, reasonably relying on the assurances from DNR that they held a leasehold possessory interest in the property at least until then.

65.     The Wilmoths are facing extreme, significant financial losses in the face of this abrupt life change and demand.

66.     The Wilmoths have had to start selling personal and sentimental tangible property items in order to fund moving elsewhere.

67.     By leasing the Subject Property to the Wilmoths, the State of Maryland created a leasehold property interest subject to Fifth and Fourteenth Amendment rights. *See, e.g., Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470 (1973).

68.     Alternatively, the interest received is represented by the State's obligation to fulfill its obligations with respect to crediting the rent credits.

69.     With eleven years remaining on the Wilmoths' rent credit, Defendants have made efforts to evict the Wilmoths from the property without making any effort to pay the Wilmoths for the improvements.

70.     Upon information and belief, Defendants intend to utilize the Subject Property for their own use by allowing state employees to reside there, during the time in which the Wilmoths' rent credit should have remained active and in good standing.

### COUNT I
**UNLAWFUL TAKING (Leasehold Interest)**
**Deprivation of Fifth and Fourteenth Amendment Rights**
**42 U.S.C. § 1983**
**(Against Individual Defendants in their Individual Capacities)**

71.     The Wilmoths adopt and incorporate by reference each allegation contained in the preceding paragraphs as if fully stated herein.

72.     The Wilmoths had a clearly established property and leasehold interest in the Subject Property through 2037 by and through the rent credit program and correspondence confirming their entitlement to the same.

73.    The Wilmoths had a clearly established right under the Fifth Amendment to the Constitution, as incorporated against the states through the Fourteenth Amendment to the Constitution, to be free from unlawful takings of private property for public use without just compensation.

74.    Defendants, acting under color of law, unlawfully took the Wilmoths' property leasehold interest without just cause or compensation, in violation of the Fifth Amendment guarantee against unlawful takings.

75.    Because Defendants have taken possession of an interest in property for some public purpose, they have a categorical duty to compensate the Wilmoths for the same.

76.    In terminating the Wilmoths' lease without compensating the Wilmoths for the remainder of their rent credit granted unto them, Defendants have improperly appropriated the Wilmoths' private property for their own use.

77.    The Defendants have substantially interfered with the Wilmoths' right to due process.

78.    As a direct and proximate cause of the Defendants' actions, the Wilmoths have suffered, and continue to suffer, damages, including but not limited to violation of their constitutional rights, loss of liberty, financial loss, emotional distress, anxiety, stigma, and embarrassment.

**COUNT II**
**UNLAWFUL TAKING (Expenditures toward Property Improvements)**
**Deprivation of Fifth and Fourteenth Amendment Rights**
**42 U.S.C. § 1983**
**(Against Individual Defendants in their Individual Capacities)**

79.    The Wilmoths adopt and incorporate by reference each allegation contained in the preceding paragraphs as if fully stated herein.

80.    The Wilmoths had a clearly established right under the Fifth Amendment to the Constitution, as incorporated against the states through the Fourteenth Amendment to the Constitution, to be free from unlawful takings without just compensation.

81.    In making the substantial property improvements, the Wilmoths expended significant funds toward materials for the home's benefit.

82.    The lease requires that any improvements made to the property shall remain on the premises; accordingly, the Wilmoths are not entitled to remove any improvements, despite the fact that the State has not finished paying for such improvements.

83.    Given that a significant portion of the improvements were in the form of permanent fixtures, Wilmoths will be permanently deprived and completely divested of their property affixed to the home, without the benefit of the equity afforded to the State of Maryland and DNR.

84.    Accordingly, the Defendants have substantially interfered with the Wilmoths' right to due process.

85.    As a direct and proximate cause of the Defendants' actions, the Wilmoths have suffered, and continue to suffer, damages, including but not limited to violation of their constitutional rights, loss of liberty, financial loss, emotional distress, anxiety, stigma, and embarrassment.

<u>COUNT III</u>
<u>BREACH OF CONTRACT</u>
**(Against Maryland and DNR)**

86.    The Wilmoths adopt and incorporate by reference each allegation contained in the preceding paragraphs as if fully stated herein.

87.    The Wimoths and the State of Maryland had a valid, enforceable residential lease.

88.    The lease provided a mechanism to receive a rent credit for approved improvements

to the propert(ies).

89.     The Wilmoths submitted significant improvements, received such approvals, and are entitled to a rent credit through June 2037.

90.     The letters contained in Exhibits C through P have confirmed the obligations of Maryland and DNR in writing, have confirmed the existence of such contractual obligations, and make clear that the consideration received by Maryland is only enhanced by the experience and expertise of the Wilmoths.

91.     By refusing to refund the Wilmoths the monies expended toward the improvements, Maryland and DNR have breached their contract.

92.     Moreover, Maryland and DNR have not refunded, nor given the Wilmoths a rent credit, for improvements made to the property from 2019 to 2025 that were necessary for their health and safety.

93.     The lease makes clear that it is the landlord's obligation to assume responsibility for repairs that relate to the tenant's health and safety.

94.     The Wilmoths have suffered and will continue to suffer damages, including but not limited to violation of their constitutional rights, loss of liberty, financial loss, emotional distress, anxiety, stigma, and embarrassment.

**COUNT IV**
**UNJUST ENRICHMENT**
**Maryland Torts Claims Act, MD State Govt § 12-100, et. seq.**
**(Against Maryland and DNR)**

95.     The Wilmoths adopt and incorporate by reference each allegation contained in the preceding paragraphs as if fully stated herein.

96.     By having to vacate on or before April 30, 2026, the Wilmoths have lost the benefit of their rent credit entitlement from May 1, 2026 until June 30, 2037.

97.    The rent credit amount owing to the Wilmoths is $81,187.17, plus $25,529.89 in improvements that were conducted prior to the cessation of the rent credit program, but before the Wilmoths received an approval letter in writing, plus $14,850 for the approved garage installation.

98.    The State of Maryland has expressly waived their sovereign immunity pursuant to the Maryland Torts Claims Act, MD State Govt § 12-100, et. seq.

99.    If the Wilmoths are forced to vacate by April 30, 2027, the State of Maryland and DNR will benefit from the $121,567.06 worth of unrealized rent credit improvements to the property, which increase the property's equity and value, at the sole expense of the Wilmoths.

100.    The benefit of the improvement was conferred on the State of Maryland and DNR by the Wilmoths.

101.    The State of Maryland and DNR were aware of, and had knowledge of, the benefits conferred upon the property during this period.

102.    The State of Maryland and DNR have accepted and retained the improvements made to the property by the Wilmoths.

103.    It is inequitable and unjust for the State of Maryland and DNR to retain these benefits without just compensation.

104.    The Wilmoths have been significantly harmed, both emotionally and financially, as a direct and proximate cause of Defendants' unjust enrichment.

105.    Specifically, the Wilmoths suffer the loss of $121,567.06, which represents monies paid out of their own pocket anticipating a leasehold interest through at least June 2037.

**COUNT V**
**DETRIMENTAL RELIANCE**
**Maryland Torts Claims Act, MD State Govt § 12-100, et. seq.**
**(Against Maryland and DNR)**

106.    The Wilmoths adopt and incorporate by reference each allegation contained in the

17

preceding paragraphs as if fully stated herein.

107.    Maryland and DNR clearly and definitely promised the Wilmoths that they would be entitled to a rent credit through at least June 2037.

108.    Maryland and DNR reasonably expected their promise would induce action or forbearance by the promise.

109.    The promise did induce actual and reasonable action or forbearance by the Wilmoths.

110.    Indeed, such reliance was reasonable considering the thirteen (13) approval letters from DNR over the course of nearly twenty (20) years.

111.    The Wilmoths continued to make substantial improvements to the property in reliance on the promise that they would be able to continue to reside there and enjoy the fruits of their labor during that time.

112.    The Wilmoths relied on such a promise to their detriment, insofar as they expended $262,516.83 of personal funds without the right to retain any equity in the property.

113.    It would be unconscionable to refuse to enforce the promise made by Maryland and DNR.

**COUNT VI**
**NEGLIGENT MISREPRESENTATION**
**Maryland Torts Claims Act, MD State Govt § 12-100, et. seq.**
**(Against Maryland and DNR)**

114.    The Wilmoths adopt and incorporate by reference each allegation contained in the preceding paragraphs as if fully stated herein.

115.    By and through their landlord/tenant relationship, Maryland and DNR owed a duty of care to the Wilmoths.

116.    Maryland and DNR, through their promise of a rent credit through at least June

2037, negligently asserted the false statement that the rent credit would indeed be honored through June 2037.

117.     In so doing, Maryland and DNR represented to the Wilmoths that they would be able to reside at the property through at least June 2037.

118.     Maryland and DNR knew or should have known that the Wilmoths would rely on their representation.

119.     Maryland and DNR intended for the Wilmoths to rely on their promise of a rent credit through at least June 2037.

120.     Maryland and DNR induced the Wilmoths into performing significant repairs to the property for the State's sole benefit, only to bait and switch the Wilmoths to force them to vacate without just compensation.

121.     Maryland and DNR knew that the Wilmoths would continue to rely on the promises of rent credits, and that if the Wilmoths did indeed rely on such promises, it would be to their detriment, causing loss or injury.

122.     The Wilmoths took significant action in reliance on the false statement by continuing to perform repairs and improvements to the property.

123.     As a direct and proximate cause of the State's false statements, the Wilmoths have been damaged, emotionally and financially, based on the State's negligent misrepresentations that the property would be available for use through at least June 2037.

**COUNT VII**
**CONVERSION (FOURTEENTH AMENDMENT TAKING)**
**Maryland Torts Claims Act, MD State Govt § 12-100, et. seq.**
**(Against Maryland and DNR)**

124.     The Wilmoths adopt and incorporate by reference each allegation contained in the preceding paragraphs as if fully stated herein.

19

125.    By and through their actions that constitute a taking under the Fifth and Fourteenth Amendments, Maryland and DNR have committed common law trespass and conversion against the Wilmoths' property.

126.    In essence, Maryland has converted the Wilmoths' money for its own use.

127.    Maryland has re-entered the property to take the improvements with the express intent to do so.

128.    Taking possession of the improvements without just compensation is inconsistent with the Wilmoths' ownership rights over the leasehold interest and improvements made that have not been reimbursed.

129.    In so doing, Maryland and DNR have seriously interfered with the Wilmoths' continued interests in the improvements and their related leasehold interest.

130.    The Wilmoths have suffered significant damages as a result of this taking, including but not limited to $262,516.83.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court grant the following relief:

A.    Enter a judgment in favor of Plaintiffs and against all Defendants, jointly and severally, for compensatory damages;

B.    Enter a judgment in favor of Plaintiffs and against all Defendants, jointly and severally, for incidental damages;

C.    Enter a judgment in favor of Plaintiffs and against Individual Defendants for punitive damages;

D.    Assess reasonable attorneys' fees and costs of suit in favor of Plaintiffs and against

all Defendants, jointly and severally (pursuant to common law and 42 U.S.C. § 1988);

E.      Enter a declaratory judgment that all Defendants violated Plaintiffs' rights under the laws of the United States;

F.      Grant Plaintiffs such other and further relief as the nature of their cause may warrant.

## DEMAND FOR JURY TRIAL

G.      Plaintiffs hereby demand a trial by jury.


Dated: February 5, 2026                    Respectfully submitted,

                                           MCKENNA, RUSSO, LIVINGSTON,
                                           BURKETT & BURGY, LLC

                               By:      */s/ Rebecca K. Schisler-Adams*
                                        Michael N. Russo, Jr. (Bar No. 07322)
                                        Brian S. Burkett (Bar No. 20318)
                                        Rebecca Schisler-Adams (Bar No. 27307)
                                        888 Bestgate Road, Suite 215
                                        Annapolis, MD 21401
                                        Phone: (410) 216-4000
                                        Fax: (410) 216-4800
                                        Email: Schisler@McKennaRusso.com
                                        *Counsel for Plaintiff*